(No. 34160.—

SINCLAIR PIPE LINE COMPANY, Appellant, *vs.* CHARLES F. CARPENTIER, Secretary of State, *et al.,* Appellees.

*Opinion filed January 24, 1957.*

GIFFIN, WINNING, LINDER & NEWKIRK, of Springfield, (MONTGOMERY S. WINNING, and JAMES M. WINNING, of counsel,) for appellant.

LATHAM CASTLE, Attorney General, of Springfield, (MARK O. ROBERTS, and LUCIEN S. FIELD, of counsel,) for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

This appeal, taken from a decree of the circuit court of Sangamon County, involves the revenue and questions both the construction and constitutionality of certain provisions of the Business Corporation Act which served as the basis for an annual franchise tax and increased license fee assessed in 1955 by the State of Illinois against appellant, the Sinclair Pipe Line Company, a foreign corporation engaged exclusively in interstate commerce activities within the State.

The facts are either stipulated or admitted by the pleadings and disclose that appellant is a Delaware corporation whose principal business office is in Kansas. On May 14,

1952, it qualified to do business in Illinois as a foreign corporation upon an application for certificate of authority which recited the following:

"Sixth—The purpose or purposes for which it was organized which it proposes to pursue in the transaction of business in this State are:

"Generally to build, own and operate pipe lines, storage facilities, pump stations and all other necessary or desirable facilities, equipment and appurtenances, including telephone, telegraph and radio communication systems, for the receipt, gathering, transportation, carriage, conveyance, storage of crude petroleum and the products and byproducts thereof and all other rights and privileges necessary or appurtenant to such business; to acquire by purchase, lease, condemnation or other appropriate proceedings interest in such lands, rights of way, easements or other property as may be necessary, useful or proper in the conduct of said business; and generally to do all other and further acts and to own, acquire, hold, use and dispose of real and personal property as may be necessary or convenient in the conduct of such business."

It is conceded that this language is broad enough to permit appellant to engage both in interstate and intrastate business in Illinois.

Following its qualification, appellant set about to acquire land and easements to accomplish its purpose and in some instances, all prior to 1955, its acquisitions were made through eminent domain proceedings initiated in Illinois courts. The stipulation sets forth that appellant has at all times paid all *ad valorem* and property taxes assessed against its holdings by the taxing authorities of the taxing districts in which they are located. By January, 1955, appellant owned and operated three pipeline systems, originating in or traversing Illinois, which were used solely in the transportation of crude oil or oil products either through Illinois or from Illinois into the State of Missouri.

As an adjunct to its pipelines appellant maintains and operates communication systems by wire or radio along routes roughly paralleling the pipelines, and also has seven pumping stations at various sites along the three lines. These facilities are operated and maintained by seventy-three employees, all of whom are paid from the Kansas office. It is stipulated that appellant engages in no intra-state business and that all its activities and property in Illinois are devoted exclusively to its business of transporting oil or oil products in interstate commerce.

As it existed in 1955, section 138 of the Business Corporation Act, (Ill. Rev. Stat. 1955, chap. 32, par. 157.138,) imposed franchise taxes on foreign corporations authorized to do business in Illinois in the following terms:

"Each foreign corporation authorized to transact business in this State shall pay to the Secretary of State the following franchise taxes, computed on the basis, at the rates and for the periods prescribed in this Act:

"(a) An initial franchise tax at the time of filing its application for a certificate of authority to transact business in this State.

* * *

"(d) An annual franchise tax during the month of July of each year in which the corporation is required by this Act to file an annual report."

The annual report referred to is covered by section 115 of the act, (par. 157.115,) which directs each "foreign corporation authorized to transact business in this State" to file, within the time prescribed by the act, an annual report containing specific data and such other information as may be necessary or appropriate to enable the Secretary of State to determine and assess the amount of fees and franchise taxes payable by such corporation. Section 116, in turn, provides that the annual report of a foreign corporation shall be filed between January 15 and the last day of February in each year, while section 139 contains

provisions which permit such a corporation to elect to file a subsequent annual report on or before June 25 and before the payment of its annual tax. See: Ill. Rev. Stat. 1955, chap. 32, pars. 157.116 and 157.139.

In addition to the annual franchise tax, license fees are required to be paid by foreign corporations in accordance with the following provisions of section 135 of the Business Corporation Act:

"The Secretary of State shall charge and collect from each foreign corporation authorized to transact business in this State the following license fees, computed on the basis and at the rates prescribed in this Act:

"(a) An initial license fee at the time of filing its application for a certificate of authority to transact business in this State.

\* \* \*

"(d) An additional license fee during the month of July of each year in which the corporation is required by this Act to file an annual report whenever such report discloses an increase in the amount represented in this State of the sum of its stated capital and paid-in surplus over the amount previously determined to be represented in this State in accordance with the provisions of this Act."

The basis for the computation of both the franchise taxes and the license fees required of a foreign corporation is supplied by section 136 of the act, (par. 157.136,) while the rate of tax and rate for license fees is provided by sections 140 and 137, respectively. (Pars. 157.140 and 157.137.) Insofar as pertinent to this proceeding, the formula provisions of section 136 are as follows:

"For the purpose of determining the amount represented in this State of the sum of the stated capital and paid-in surplus of a foreign corporation, the amount represented in this State shall be that proportion of the sum of its stated capital and paid-in surplus which the sum of (1) the value of its property located in this State and (2) the

gross amount of business transacted by it at or from places of business in this State bears to the sum of (1) the value of all its property, wherever located, and (2) the gross amount of its business, wherever transacted."

In passing it is to be noted that this formula, insofar as it was applied to foreign corporations engaging both in intrastate and interstate commerce in Illinois, was approved in *Western Cartridge Co.* v. *Emmerson,* 281 U.S. 511, 74 L. ed. 1004, affirming 335 Ill. 150, and in *Hump Hairpin Mfg. Co.* v. *Emmerson,* 258 U.S. 290, 66 L. ed. 622, affirming 293 Ill. 387.

Appellant states in its reply brief that it paid an initial license fee at the time it qualified to do business in 1952, but we find no indication that it was called upon to pay an initial franchise tax or an annual franchise tax for 1953 and 1954. Subsequent to the filing of its annual report in February, 1955, appellant received a notice from the Secretary of State that it had been assessed for the year commencing July 1, 1955, an annual franchise tax of $2054.18 and also that it had been assessed an additional license fee of $13.15 for the same year. Upon receipt of such notice appellant requested a hearing which was granted and held on June 24, 1955. At that time appellant contended that it did no local or intrastate business, that it was engaged exclusively in interstate commerce in Illinois and thus was not liable for the assessments. While the Secretary of State apparently disagreed with such position, appellant was advised that the franchise tax would have to be paid unless it could withdraw by filing an application for withdrawal prior to July 1, 1955. Accordingly, on June 29, appellant submitted an application for a certificate-of-withdrawal proceeding under section 120 of the Business Corporation Act, (Ill. Rev. Stat. 1955, chap. 32, par. 157.120,) which states in part:

"A foreign corporation authorized to transact business in this State may withdraw from this State upon procuring

from the Secretary of State a certificate of withdrawal. In order to procure such certificate of withdrawal, such foreign corporation shall file with the Secretary of State an application for withdrawal and a final report.

"The application for withdrawal shall set forth:

"(a) That no proportion of its issued shares is on the date of such application represented by business transacted or property located in this State."

The application filed by appellant modified the form of withdrawal provided by the Secretary of State by inserting the following words: "said business is exclusively in interstate commerce and said property is used exclusively in interstate commerce," after a printed phrase which reads as follows: "That no portion of its issued shares at this time is represented by business transacted or property located in this State." On the same day the Secretary refused to file the application, his letter to appellant stating that this court had held in *Pennsylvania Co. v. Bauerle,* 143 Ill. 459, that the ownership and control of real property in this State in itself is the transaction of business here, and that the Secretary knew from reliable sources that the appellant corporation did in fact own real estate in Illinois.

To avoid penalties imposed by the Business Corporation Act appellant paid the franchise tax and additional license fees under protest and thereafter commenced this action in equity seeking a refund and an order compelling the Secretary of State to issue a certificate of withdrawal as of June 29, 1955. The facts of the case substantially as stated, were stipulated, and in addition the contentions of the adversaries were stipulated as follows:

"10. It is the contention of Sinclair Pipe Line Company that it is not engaging in any local intrastate business by virtue of its ownership of real and personal property within the State, or by virtue of the activities conducted by it within the State, or by virtue of both such ownership and

such activities; and, therefore, it is not subject to the annual franchise tax or the additional license fee imposed by The Business Corporation Act. Sinclair Pipe Line Company further contends that by domesticating in the State of Illinois it acquired no rights or privileges in the State of Illinois over and above or in addition to those it possessed immediately prior to such domestication.

"11. It is the contention of defendants that the franchise tax imposed by Illinois on this foreign corporation was no attempt to tax the privilege of doing an interstate business or to secure anything from the corporation except compensation for the protection of various local activities of the corporation, including the maintaining, keeping in repair and otherwise in manning the facilities of the corporation in Illinois and including the privilege of using State courts for acquisition of property by eminent domain proceedings. That plaintiff, voluntarily and of its own volition, applied for a certificate of authority as a foreign corporation under the Business Corporation Act of Illinois. That this corporation, having voluntarily qualified under the Business Corporation Act, should comply with the requirements of the Business Corporation Act in seeking to obtain a certificate of withdrawal, as authorized by said Act."

Upon consideration of the pleadings, stipulation and arguments of counsel, the chancellor dismissed the complaint finding only that the equities in the cause were with the State.

The first issue drawn in this court between the parties is whether the franchise tax provided for in the Business Corporation Act is, as applied to a foreign corporation, imposed upon the privilege granted the corporation to exist or to exercise its corporate functions in Illinois, or whether it is imposed upon the exercise of such privilege. For the State it is contended that, regardless of property owned or business transacted within Illinois, the tax is levied upon the granting of the privilege and, inasmuch as ap-

pellant's certificate of authority gave it the privilege of doing intrastate business, appellant is liable for the tax whether or not the privilege was exercised. As thus construed, it is argued, the constitutional problem of whether the tax inflicts a prohibited burden on appellant's interstate business is not reached. Appellant, on the other hand, adopts the position that the franchise tax is imposed upon the exercise of the privilege granted and, since it did no intrastate business in Illinois, denies its liability for the tax. Consistent with this position, it urged that even if the tax is construed as being on the privilege of doing business, its assessment against a corporation engaged exclusively in interstate business would be in derogation of the commerce clause of the Federal constitution, (U.S. Const. art. I, sec. 8,) as construed by an unbroken line of decisions of the United States Supreme Court holding that no State may levy privilege, excise or franchise taxes on a foreign corporation for the privilege of carrying on or the actual doing of solely interstate business.

*St. Louis Southwestern Railway Co.* v. *Stratton,* 353 Ill. 273, is determinative of the construction to be afforded the franchise tax. In that case, where minimum annual franchise taxes imposed by the General Corporation Act of 1919, (Laws of 1919, p. 312 *et seq.*) were under consideration, the protestant was a railroad, qualified to do business in Illinois as a foreign corporation, which engaged in both intrastate and interstate transportation of freight and passengers. The great bulk of its business, however, was interstate, thus the impact of the franchise tax was almost completely on such commerce. On this basis it was urged that the franchise tax was a direct burden on the railroad's interstate traffic contrary to the Federal commerce clause. When the State sought to defend that the tax was on the privilege of the corporation to maintain its rights in this State and to exercise them as it desired, without relation to the amount of property held or the

amount of business transacted in the State, its argument was rejected by the court in these terms (pp. 277-278): "That the annual franchise tax provided under sections 105 and 107 is not levied as pay for the privilege or authority of doing business in Illinois is shown by section 101 of the general Corporation Act, where the legislative purpose in that direction is made clear by this language: 'Each foreign corporation for pecuniary profit, * * * in addition to the annual franchise fees and taxes hereinafter provided, shall pay to the Secretary of State for its certificate of authority to do business in Illinois, the same fees provided by this act to be paid by a similar corporation incorporated under the laws of this State.' The distinction seems clear between an initial or admission fee, by which the State, largely as a protective measure, may exact, in its discretion, either large or small fees from foreign corporations for the privilege of doing business in the State, and a franchise or excise tax, levied principally for revenue purposes upon the exercise of the franchise or contract rights previously granted." Again, at a later stage of the opinion (p. 284) the court repeated its conclusion in this manner: "It must be borne in mind that the franchise or excise tax involved here is not a tax upon a property right, tangible or intangible, but is a tax laid upon the exercise of an extraordinary privilege. If the privilege is not exercised there can be no tax. The power to tax depends upon what was done—not upon what might have been done. (*Ozark Pipe Line Corp.* v. *Monier*, 266 U.S. 560, 69 L. ed. 439.)" We have thus an authoritative finding that franchise taxes imposed upon a foreign corporation are laid upon the exercise of the privilege granted to do business and not upon the privilege itself. Under such a construction it is clear that appellant is not liable for the tax here under consideration because of the circumstance that its certificate of authority granted it the privilege of doing intrastate business.

The State seeks to avoid the construction in the foregoing decision by asserting that it is not in point because it arose under the General Corporation Act of 1919, whereas the present case arises under the Business Corporation Act of 1933. It is argued, in effect, that the later statute imposes a different kind of franchise tax, that is, one imposed irrespective of whether authorized corporations exercise their privilege of doing business or not. This conclusion is reached from the provision of section 138, (Ill. Rev. Stat. 1955, chap. 32, par. 157.138,) which requires the payment of an initial franchise tax before a certificate of authority is granted, and from those provisions of section 138 and section 115, (par. 157.115,) which ordain that each foreign corporation authorized to do business shall file an annual report, and which provide that an annual franchise tax is payable in each year the corporation is required to file an annual report. In other words, the State urges that since an initial franchise tax is payable before any business is done, and because all foreign corporations authorized to transact business in this State must file an annual report and pay a tax on the basis of such report whether or not they are actually doing business, the franchise taxes exacted are laid on the privilege granted to do business rather than the exercise of the privilege. The weakness of such argument lies in the fact the act of 1919 contained provisions of identical purport when the tax considered in the *St. Louis Southwestern Railway Company case* was assessed. Section 129 of that act, (Cahill's Stat. 1929, chap. 32, par. 129,) required payment of a franchise tax in advance from corporations admitted to do business in terms which cannot, in principle, be distinguished from the present requirement of an initial payment, and likewise provided for an annual franchise tax based on the latest annual report. Section 102 (Cahill's Stat. 1929, chap. 32, par. 112,) required that each corporation, domestic or

foreign, should file an annual report with the Secretary of State, and the provisions for payment of license fees are similar in both acts.

When these statutory similarities are measured in the light of the legislative awareness of the construction this court has placed on the franchise tax provisions of the 1919 act, we cannot say that a new concept of such a tax was either effected or intended. It is our opinion that the distinction still obtains between a license fee exacted for the privilege of doing business in the State and a franchise tax levied upon the exercise of the privilege granted; thus we find no basis to say that all assessments have been lifted from the exercise of the privilege and tacked upon the granting of the privilege. Since appellant did not exercise its privilege of doing intrastate business, no liability for the tax may be said to have resulted from the mere granting of such unexercised privilege.

Our conclusion brings us to the issue of whether the franchise tax may be imposed upon a foreign corporation, such as appellant, when its privilege of doing business in this State is exercised exclusively in interstate commerce. Appellant contends that this question has been answered in the negative by an unbroken line of decisions by our Federal courts extending over a period of sixty years; the State contends that, under more recent concepts, the local activities in maintaining, repairing and otherwise manning the interstate transportation system are sufficient to justify the imposition of a franchise tax. We find the question not to be entirely free from doubt.

A significantly similar case to the present one is *Ozark Pipe Line Corporation* v. *Monier* (1925), 266 U.S. 555, 69 L. ed. 439. The company there involved was a Maryland corporation qualified to do business in Missouri. It owned and operated a pipeline extending from Oklahoma through Missouri into Illinois which was used for the

transportation of crude oil from Oklahoma to Illinois. The company maintained its principal office in Missouri, from whence it conducted all its business operations, and also maintained communication systems and pumping stations in that State which were devoted exclusively to the interstate transportation of oil. A Missouri statute provided that every corporation not organized in the State, but engaged in business therein, should pay an annual franchise tax. However, when the State sought to assess the tax against the pipeline company, the Supreme Court denied its power in these terms: "The tax is one upon the privilege or right to do business [citation]; and if appellant is engaged only in interstate commerce, it is conceded, as it must be, that the tax, as far as appellant is concerned, constitutionally cannot be imposed. It long has been settled that a state cannot lay a tax on interstate commerce in any form,—whether on the transportation of subjects of commerce, the receipts therefrom, or the occupation or business of carrying it on. [Citations.] Plainly, the operation of appellant's pipeline is interstate commerce and beyond the power of state taxation." 266 U.S. p. 562; 69 L. ed. p. 442.

Although not a pipeline case, an oft-cited decision reiterating the principle of the *Ozark case* is *Alpha Portland Cement Co.* v. *Massachusetts* (1925), 268 U.S. 203, 69 L. ed. 916. There the foreign corporation maintained a district sales office in Massachusetts. The State sought to impose a tax described as an excise "for the privilege of having a place of business under the protection of our laws, and with the financial, commercial, and other advantages flowing therefrom, measured solely by the property and net income fairly attributable to the business done here by a foreign corporation." It was conceded that all business of the company in Massachusetts was interstate business. The court declared the tax invalid under the circumstances, saying: "Here also the excise was demanded

on account of interstate business. A new method for measuring the tax had been prescribed but that cannot save the exaction. Any such excise burdens interstate commerce, and is therefore invalid without regard to measure or amount." 268 U.S. p. 217; 69 L. ed. p. 923.

There is thus to be found in the two cases authoritative statements of the basic principle that an excise tax upon a foreign corporation doing an exclusively interstate business within the taxing State violates the commerce clause of the Federal constitution. Counsel for the State recognize the principle but contend that the force of such decisions has been greatly weakened, if not entirely done away with, by more recent decisions which hold that the local activities of a foreign corporation engaged exclusively in interstate commerce may be subjected to a franchise tax without doing violence to the commerce clause.

Chief among the decisions relied upon are *Memphis Natural Gas Co.* v. *Stone* (1948), 335 U.S. 80, 92 L. ed. 1832; *Interstate Natural Gas Co.* v. *Stone* (1939), 308 U.S. 522, 84 L. ed. 442; *Southern Natural Gas Corp.* v. *Alabama* (1937), 301 U.S. 148, 81 L. ed. 970; and *Interstate Oil Pipe Line Co.* v. *Stone* (1949), 337 U.S. 662, 93 L. ed. 1613. Looking to these decisions in the order of their rendition we find that the *Alabama case* has no application here because of statutory and factual differences. There the franchise tax sought to be imposed upon the foreign corporation, an interstate pipeline, was construed as being laid upon the privilege given to exercise corporate functions in the State of Alabama, and the Supreme Court held that such tax was not repugnant to the commerce clause of the Federal constitution where the corporation engaged in local activities by reducing the pressure of the gas at the point of delivery to meet the needs and requirements of local purchasers and by establishing local lines for their convenience. Apart from the fact that we have construed our statute as imposing the franchise tax upon

the exercise of the privilege granted, appellant in this case did not make local sales or engage in local activities of a comparable nature.

*Interstate Natural Gas Co.* v. *Stone,* 308 U.S. 522, may likewise be distinguished upon statutory dissimilarities. The decision, which is a memorandum affirming the Circuit Court of Appeals, in 103 F.2d 544, gave sanction to a Mississippi tax which was construed as being imposed upon the privilege granted to do business in that State. The lower court held that the foreign corporation, which had been given the privilege to do intrastate business, could not escape liability for the tax merely because it chose only to transact interstate business.

In *Memphis Natural Gas Co.* v. *Stone,* 335 U.S. 80, a Mississippi franchise tax measured by the value of capital invested or employed in the State was sustained in the case of a gas pipeline company a portion of whose line passed through the State but which did no local business there. The statute imposing the tax defined "doing business" to include "every act, power or privilege exercised or enjoyed in the State." After finding the language of the statute susceptible to the construction that the tax was imposed for the purpose of compensating the State for the protection afforded local activities, three Justices, speaking by Justice Reed, held that the tax was on the intrastate activities of the company in maintaining its facilities there, and was no more burdensome than concededly valid *ad valorem* taxes on the company's property in the State. Justice Rutledge held that the tax was valid because it did not discriminate against interstate commerce nor invite multiple taxation, while Justice Black concurred without opinion. Four Justices, speaking by Justice Frankfurter, contended that the pipeline had already paid the *ad valorem* taxes to which Justice Reed had adverted and that the franchise tax must therefore be regarded as being on the interstate privilege. The Illinois statute which states only

that "each foreign corporation authorized to transact business in this State" shall pay franchise taxes, contains no language which may reasonably be construed as meaning that the taxes are intended only to compensate the State for the protection afforded local activities. The impact is, rather, on the business itself, whether it be intrastate or interstate.

The next case relied upon by the State is *Interstate Oil Pipe Line Co.* v. *Stone*, 337 U.S. 662, which was decided in 1949. There, Justice Rutledge, speaking for himself and three other Judges, endorsed the view that Mississippi was within her rights in imposing on a Delaware corporation, as a condition of doing local business, a "privilege" tax equal to two per cent of its intrastate business even though the exaction amounted to "a 'direct' tax on the 'privilege' of engaging in interstate commerce," which assertion was countered by one just as positive, and also endorsed by four Justices, that no State may "levy privilege, excise or franchise taxes on a foreign corporation for the privilege of carrying on or the actual doing of interstate business," even though the tax is not discriminatory and is fairly apportioned between the corporation's intrastate and interstate business. The tax was sustained by the vote of the ninth Justice, who construed it as being levied only on the privilege of engaging in intrastate commerce. In that case, unlike the present, there was, within Mississippi, a loading of oil on racks to await rail transportation out of the State and it is apparent from the opinion of the ninth Justice, whose view decided the case, that such intrastate activity was the basis for sustaining the tax.

The diversity of view reflected by the decisions discussed and others relating to the power of the States to tax the proceeds of interstate commerce or property engaged in interstate commerce would make it appear that no set guiding principle has as yet been found in this field of constitutional law. It is our opinion, however, shared

by the Supreme Court of Alabama in *State* v. *Plantation Pipe Line Company,* 89 So.2d 549, (*certiorari* denied by United States Supreme Court, (Dec. 1956,) 1 L. ed.2d 237,) that, for the present at least, the more recent case of *Spector Motor Service, Inc.* v. *O'Connor* (1951), 340 U.S. 602, 95 L. ed 573, has restored the basic principle of the *Ozark* and *Alpha Cement cases* that a franchise tax upon a foreign corporation engaging exclusively in interstate commerce within the taxing State is unconstitutional under the commerce clause. This result was reached, as the dissenting opinion points out, even though the local aspects of the corporation's business were "at least as extensive as those which validated a 'privilege' tax in *Memphis Natural Gas Co.* v. *Stone,* 335 U.S. 80."

In the *Spector case* a Connecticut statute imposed on corporations a tax measured by the net income from business transactions within the State, which was construed by the State court to be "a tax or excise upon the franchise of corporations for the privilege of carrying on or doing business in the state, whether they be domestic or foreign." The main issue was whether the commerce clause invalidated the tax as applied to a foreign corporation which engaged exclusively in the interstate transportation of freight by motor truck. The facts of the case showed that the trucking company was a Missouri corporation, with its principal place of business in Illinois. It was authorized by the Interstate Commerce Commission to do certain interstate trucking and by the Connecticut authorities to do part of such interstate trucking in Connecticut. The company filed with the Secretary of State of Connecticut a certificate of its incorporation in Missouri, designated an agent in Connecticut for service of process and paid the State fee required in that connection. No authority was sought or granted to engage in intrastate commerce. The company's business was interstate transportation of motor freight between east and west. When a full truckload was to be

shipped to or from any customer in Connecticut, the company's over-the-road truck went directly to the customer's place of business. In case of less-than-truckload shipments, pickup trucks operated by the company gathered the freight from customers for assembly into full truckloads at either of two terminals maintained within the State. Under such facts, six Justices of the court, speaking by Justice Burton, concluded: "The incidence of the tax is upon no intrastate commerce activities because there are none." (340 U.S. p. 606; 95 L. ed. p. 577.) After pointing out that the State court had itself held that the tax attached solely to the franchise of the company to do interstate business, the court went on to hold:

"This Court heretofore has struck down, under the Commerce Clause, state taxes upon the privilege of carrying on a business that was *exclusively* interstate in character. The constitutional infirmity of such a tax persists no matter how fairly it is apportioned to business done within the state. *Alpha Portland Cement Co.* v. *Massachusetts*, 268 U.S. 203, 69 L. ed. 916, 45 S.Ct. 477, 44 A.L.R. 1219 (measured by percentages of 'corporate excess' and net income); *Ozark Pipe Line Corp.* v. *Monier*, 266 U.S. 555, 69 L. ed. 439, 45 S. Ct. 184 (measured by percentage of capital stock and surplus). See *Interstate Oil Pipe Line Co.* v. *Stone*, 337 U.S. 662, 669 *et seq.*, 93 L. ed. 1613, 1621, 69 S. Ct. 1264 (dissenting opinion which discusses the issue on the assumption that the activities were in interstate commerce); *Joseph* v. *Carter & Weekes Stevedoring Co.* 330 U.S. 422, 91 L. ed. 993, 67 S. Ct. 815; *Freeman* v. *Hewit*, 329 U.S. 249, 91 L. ed. 265, 67 S. Ct. 274, *supra.*

"Our conclusion is not in conflict with the principle that, where a taxpayer is engaged both in intrastate and interstate commerce, a state may tax the privilege of carrying on intrastate business and, within reasonable limits, may compute the amount of the charge by applying the

tax rate to a fair proportion of the taxpayer's business done within the state, including both interstate and intrastate. (*Interstate Oil Pipe Line Co.* v. *Stone,* 337 U.S. 662, 93 L. ed. 1613, 69 S. Ct. 1264, *supra; International Harvester Co.* v. *Evatt,* 329 U.S. 416, 91 L. ed. 390, 67 S. Ct. 444; *Atlantic Lumber Co.* v. *Commissioner of Corporations & Taxation,* 298 U.S. 553, 80 L. ed. 1328, 56 S. Ct. 887.) The same is true where the taxpayer's business activity is local in nature, such as the transportation of passengers between points within the same state, although including interstate travel. *Central Greyhound Lines* v. *Mealey,* 334 U.S. 653, 92 L. ed. 1633, 68 S. Ct. 1260, or the publication of a newspaper, *Western Live Stock* v. *Bureau of Revenue,* 303 U.S. 250, 82 L. ed. 823, 58 S. Ct. 546, 115 A.L.R. 944. See also *Memphis Gas Co.* v. *Stone,* 335 U.S. 80, 92 L. ed. 1832, 68 S. Ct. 1475.

"In this field there is not only reason but long-established precedent for keeping the federal privilege of carrying on exclusively interstate commerce free from state taxation. To do so gives lateral support to one of the cornerstones of our constitution law. *M'Culloch* v. *Maryland* (U.S.), 4 Wheat. 316, 4 L. ed. 579, *supra.*" 340 U.S. pp. 609-610, 95 L. ed. p. 578-579.

The State of Illinois in the present case seeks to distinguish the *Spector case* on the ground that the foreign corporation there had not qualified to do intrastate business as had the appellant in the present case. When it is considered that it is stipulated here that appellant transacted no intrastate business, there can be no validity to such a distinction, for in neither case can it be said that the incidence of the tax was on intrastate activities. It is true appellant necessarily engaged in local activities in operation, maintenance and repair of its pipelines and communications systems, but under the principle of the *Spector case* such activities must be regarded merely as a part of the interstate transportation of oil. Nor, under the facts,

does it matter whether the franchise tax be construed as being upon the granting of the privilege to appellant or upon the exercise of such privilege; in either case it is appellant's interstate business which bears the burden. (See: *Ozark Pipe Line Corporation* v. *Monier,* 266 U.S. 555, at 567, 69 L. ed. 439 at 444.) Inasmuch as the Federal decisions interpreting the interstate commerce clause necessarily control our decision, we must hold, in light of the principles reaffirmed in the *Spector case,* that, as applied to appellant, it was beyond the power of the State to levy the franchise tax in question.

There remains the issue of whether the Secretary of State improperly refused to allow appellant to withdraw from Illinois, and to thus permit it to escape assessment of the increased license fee. As previously stated, section 120 of the Business Corporation Act (Ill. Rev. Stat. 1955, chap. 32, par. 157.120,) provides that the application for withdrawal shall set forth "That no proportion of its issued shares is on the date of such application represented by business transacted or property located in this State." Appellant, while admitting that it owned property in the State within the purview of the section, has adopted the view that the section has no application when all such property is devoted exclusively to interstate commerce. No such limitation is made in the statute and to adopt such a contention would be to hold that interstate commerce is conducted in a vacuum without regard to its tangible property within the State. We agree with the State that appellant, having chosen to domesticate in Illinois under the provisions of our laws, must take the burdens as well as the benefits resulting from such action. Under the circumstances of the case, the action of the Secretary of State in refusing a certificate of withdrawal was entirely proper and within the letter and spirit of the law.

For the reasons stated the decree of the circuit court of Sangamon County dismissing the suit for want of equity

is reversed, and the cause is remanded to that court for the entry of a decree consistent with the views expressed in this opinion.

*Reversed and remanded, with directions.*